# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MACH MOLD INC. and )
INDIANA INSURANCE CO., as subrogee )
of Mach Mold Inc. )
                                )
        **Plaintiffs,** )
                                )    **No.  03 C 7757**
**v.** )
                                )    **HONORABLE DAVID H. COAR**
CLOVER ASSOCIATES, INC. d/b/a )
Machinery Supply and )
KINGMAN DEDICATED SERVICE, INC. )
                                )
        **Defendants.** )
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ )
                                )
CLOVER ASSOCIATES, INC. )
               **Cross-Claim Plaintiff** )
                                )
**v.** )
                                )
KINGMAN DEDICATED SERVICE, INC. )
               **Cross-Claim Defendant** )
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ )
                                )
KINGMAN DEDICATED SERVICE, INC. )
               **Counterclaim & Third-** )
               **Party Plaintiff** )
                                )
**v.** )
                                )
KM INDUSTRIAL MACHINERY CO.; )
GES EXPOSITION SERVICES; CITY OF )
CHICAGO; F.H. PASCHEN, S.N. )
NIELSEN, INC.; ILLINOIS BELL )
TELEPHONE; & PEOPLE'S GAS LIGHT )
& COKE CO. )
                                )
        **Third-Party Defendants.** )
                                )

<u>**MEMORANDUM OPINION AND ORDER**</u>

**I.     FACTS**

Plaintiff Mach Mold is a custom builder of plastic molds. Mach Mold has a facility in Benton Harbor, Michigan. In 2001, Mach Mold became interested in acquiring a horizontal milling machine for its facility. Some time during 2001, Mach Mold contacted Leading Edge New Machinery, Inc. ("Leading Edge"), which sold machinery to machine and die shops in the United States, about the possibility of purchasing such a machine. Leading Edge was also an importer of milling machines made by Eumach, a Taiwanese company. Leading Edge put Mach Mold in contact with KM Industrial Machinery Supply, one of the machinery dealerships with which it worked. Mach Mold had purchased machinery through KM several times over an approximately twenty-year period. On July 18, 2001, KM sent Mach Mold a written quote for a Eumach horizontal milling machine ("the Machine") for $315,000. Between July 2001 and late summer 2002, Mach Mold and KM continued to discuss terms of a possible sale. In late summer 2002, KM notified Mach Mold that it could offer the Machine at a discount, if Mach Mold would agree to let the Machine be displayed at the International Machinery and Technology Show ("IMTS") in Chicago, Illinois. KM quoted a new (discounted) price of $285,000, but stated that all of the other terms of sale remained the same, in keeping with the written quote and terms of sale provided in July 2001. According to the written terms and conditions attached to the original sales quote, KM would retain title to the Machine until the contract price was fully paid, but the sale would be free on board ("FOB") at the point of shipment and the buyer would bear any risk of loss after KM tendered the machine. KM expressly disclaimed liability for any

damages that might occur during or pursuant to shipping and specified that the buyer would have to seek recovery from the carrier directly.

Mach Mold agreed to KM's revised quote, including the requirement that the Machine be displayed at the IMTS. Mach Mold then sought financing for the purchase, specifically a financial lease through a bank. Mach Mold began discussions for a financial lease with Fifth Third Bank, whereby Fifth Third would purchase the Machine and lease it to Mach Mold as the end user. At the conclusion of the lease period, Mach Mold would purchase the Machine for its fair market value. During the lease negotiations, Bill Mach, the president of Mach Mold, attended the IMTS. While there, he verbally agreed on the terms of a related sales deal with Christopher Bologna, the president of Leading Edge. This deal involved the sale of a Numera boring machine that Mach Mold wished to sell or trade- in for additional discounting on the price of the Machine. Because a bank would only offer a financial lease for the amount that Mach Mold actually paid for the Machine, Leading Edge agreed to purchase the Numera machine outright for $45,000, rather than accept it as a trade-in, and to pay Mach Mold with the money it received for the Machine from KM. This served as an indirect rebate of $45,000 of the Machine's $285,000 contract price, but enabled Mach Mold to negotiate for a financial lease for the full $285,000.

The structure of the sales deal for the Machine went as follows: Eumach sold the Machine to Leading Edge, which sold it to a machinery dealer, KM Industrial, which sold the Machine to Mach Mold. Mach Mold was to pay KM Industrial $285,000 for the Machine. KM Industrial was to pay Leading Edge $285,000 or some agreed portion thereof for the Machine. At the same time, Mach Mold sold its Numera machine to Leading Edge, which was to pay Mach

Mold with the money from KM Industrial from the sale of the Machine itself. The parties did not reduce the sales agreement to a written memorandum.

Eumach put the Machine on an ocean vessel in Taiwan, at which point ownership transferred from Eumach to Leading Edge, pursuant to the terms of the agreement. Leading Edge brought the Machine to the Port of Seattle and then shipped it via truck to Chicago for the IMTS. The Machine arrived at a warehouse in Chicago still in its sheet metal shipping container. At the warehouse, Leading Edge had the Machine uncrated and prepared for exhibition. The shipping crate and packing material were discarded by the warehouse company. From the warehouse, Leading Edge had the Machine transferred by flatbed truck to McCormick Place convention center in Chicago, where the IMTS took place. GES Exposition Services provided convention services to McCormick Place. During IMTS 2002, GES unloaded the Machine from the flatbed truck and positioned it in Leading Edge's booth on the exhibition floor. At some point during the IMTS show, two large steel electromagnets weighing several hundred pounds each were placed on the table of the Machine. The Machine was "dry-cycled" during the IMTS, meaning that it was connected to a power source but that no coolant was loaded and no actual work performed.

At the end of the IMTS 2002 show, Leading Edge filled out a GES outbound material handling services order form, which specified that GES would move the Machine from the exhibition floor to the loading dock and help load the Machine onto a truck trailer. At the bottom of the form in block letters is the phrase, "This is not a bill of lading." No bill of lading was created; however, both Leading Edge and the carrier regarded the outbound material handling services order form as a bill of lading despite the written disclaimer. Leading Edge did not request that GES crate the Machine or provide packing material or dunnage. According to the

written sales quote KM provided to Mach Mold in June 2001, the Machine would be shipping free on board ("FOB") from a West Coast Port. The attached "KM Industrial Terms and Conditions of Sale" specified that "All sales are made F.O.B. point of shipment. Seller's title passes to Buyer and Seller's liability as to delivery ceases upon making delivery of material purchased hereunder to carrier at shipping point in good condition; the carrier acting as Buyer's agent. All claims for damages must be filed with the carrier."  Leading Edge understood that Mach Mold would arrange for a carrier to pick up the Machine from McCormick Place and informed the GES representative that information about Mach Mold's carrier would be forthcoming.

In late August 2002, Mach Mold contacted Clover Associates, a trucking company it had previously used to transport machinery, and asked it to visit Mach Mold's facility. On August 29, 2002, Clover faxed a written quote to Mach Mold for the transportation of the Machine from Chicago, Illinois to Benton Harbor, Michigan. The quoted cost, including permits and flag cars, was given as $2,614.00. Mach Mold and Clover agreed that Clover would also transport the Machine's tool changer and other components from a Chicago warehouse to Benton Harbor in a separate shipment for a cost of $1,050.00. Because of labor issues at McCormick Place, Clover told Mach Mold in or about September 2002 and advised that it preferred to use a "union carrier" to transport the main section of the Machine from Chicago to Benton Harbor. Clover accordingly contacted Kingman Dedicated Services, which was a "union carrier," and requested a quote for tranporting the Machine from Chicago to Benton Harbor, including the cost of obtaining the necessary permits and required escort vehicle for the load. In or about early September, Mach Mold agreed to the use of a second carrier, provided that the carrier carried sufficient insurance

to cover the cost of the Machine. Mach Mold requested that Clover provide proof of insurance from Kingman. Mach Mold did not communicate with Kingman prior to September 18, 2002.

Sometime prior to September 16, 2002, Clover notified Kingman that it accepted Kingman's quote to pick up and transport the Machine from McCormick Place in Chicago to Benton Harbor. Kingman then obtained oversize load permits for transporting the Machine from Chicago to Benton Harbor. On September 16, 2002, Kingman's semi-truck, double drop flatbed trailer arrived at McCormick Place with William Golembieski as its driver. Golembieski was not called to a loading dock until September 17, 2002, at which time GES personnel loaded the Machine onto Kingman's flatbed trailer in good condition. Golembieski secured the Machine to the flatbed trailer with four chains, and secured eleven boxes of equipment related to the Machine on his trailer. He then covered the boxes and Machine with a tarpaulin, which was strapped to the trailer. The Machine protruded at least one foot over each side of the eight-and-a-half foot wide double drop flatbed trailer. Golembieski signed the order form for outbound material handling services without exception, accepting the Machine in good condition. Golembieski then began driving the Machine along the route specified in the City of Chicago oversized load permit towards interstate highways I-80/I-94. The City permit routed Kingman along Torrence Avenue on Chicago's south side and then onto I-80/I-94.

Torrence Avenue is a four lane road, with two lanes for traffic going northbound and two lanes for southbound traffic. On September 17, 2002, at least one section of Torrence Avenue was undergoing construction work somewhere in the area between 95th Street and 130th Street. In the construction zone, the normal traffic pattern had been disrupted. The northbound lanes were closed for construction and one southbound lane had been converted into a northbound lane.

Thus, both north- and southbound traffic were travelling in what were normally the two southbound lanes. Despite the fact that he was driving an oversize load, Golembieski determined that he would be able to safely drive through the construction zone. (Golembieski Dep., at 113.) At some point along Torrence Avenue between 95th Street and the I-94 entrance ramp, while Golembieski was driving in the southbound lane, the Machine apparently struck a stationary roadside pole, which may have been a telephone or utility pole. The driver did not notice anything to indicate that the roadway, the curb, or the pole had been changed as part of construction or that they were temporary. The driver did not see the Machine strike the pole, but heard a noise and felt an impact of some kind.

Golembieski did not stop the trailer immediately but continued through the construction zone to the I-94 entrance ramp. Golembieski was unable to estimate where on Torrence Avenue the Machine struck the pole or how far he drove after the impact before stopping. In any event, he stopped the trailer on the shoulder of the I-94 entrance ramp and examined the Machine. Golembieski then telephoned Kingman's emergency dispatch number to report that he apparently had struck something and that the tarp covering the Machine was now ripped. (Golembieski Dep. at 42-44.) The following morning, when Golembieski's escort driver for Indiana arrived, Golembieski inspected the Machine again and noticed that the Machine's electrical panel appeared to have "moved a little bit inside the tarp." (*Id.* at 49.) During his drive through Indiana, Golembieski stopped at a truck stop for a break. While there, he noticed that the electrical panel had "moved some," so he bought a two-inch strap to use to hold the panel in place. (*Id.* at 62.) To strap the electrical panel in place, Golembieski "wiggle[d]" into an opening at the end of the tarp and crawled along the interior. The rip in the tarp permitted sufficient light

for him to see the Machine. At the same time, he noticed that there were dents on the control panel box. (*Id.* at 63-64.) This was the first time he had looked under the tarp since leaving McCormick Place.

Golembieski then continued on to Benton Harbor, where he arrived at the Mach Mold facility, parked the trailer in the parking lot, and began to untarp the Machine. (Golembieski Dep., at 69.) Bill Mach, the owner of Mach Mold, described seeing the truck "leaning radically to the right" when it arrived and the "machine cabinet ... hanging below the canvas [tarp] on the pavement." (Mach Dep., at 77.) Mach also described a rip in the tarp covering the Machine that was approximately three to four feet long. (*Id.*) Mach informed Golembieski that he was rejecting the delivery and directed Golembieski to retarp the Machine.

Golembieski replaced the tarp on the Machine and waited for directions from Kingman's dispatcher. Kingman could not take the trailer with the Machine back to its facility in Indiana because the oversized permits had expired. Kingman's dispatcher advised Golembieski to park the trailer with the Machine on it at Mach Mold. Golembieski then unhooked his truck and left the trailer there.

Mach Mold, Leading Edge, and KM Industrial then began to discuss who owned the Machine at the time of the accident. Leading Edge informed Mach Mold that liability for the damage to the Machine was between Mach Mold and KM. In turn, KM Industrial informed Mach Mold that its liability for damage to the Machine ended when it tendered the Machine in good condition to Mach Mold's carrier at the point of shipment and that Mach Mold was still responsible for paying the agreed sales price for the Machine, despite the damage. An insurance adjuster for Kingman examined the Machine and declared it a total loss. A machinery repair

company also examined the Machine, apparently at the request of Kingman's insurer, and declared it too damaged to be repaired. Mach Mold filed a claim with its insurance carrier, Indiana Insurance Company. In January 2003, Indiana Insurance paid Mach Mold $175,000 for its claim for damages to the Machine. Mach Mold tendered the $175,000 to KM Industrial. In the normal course of business, KM would have then paid Leading Edge this money. Leading Edge, however, filed for bankruptcy in late 2002, largely because it was unable to meet its obligations and had not been paid for the Machine. KM had acquired Leading Edge's assets and accounts receivable in a bankruptcy sale. In January 2003, however, KM paid the $175,000 to Leading Edge's creditor, Bank One. Mach Mold still owes the outstanding balance on the Machine, which comes to $110,000.[1]

Sometime in January or Feburary 2003, Mach Mold moved the Machine from Kingman's trailer in the parking lot into Mach Mold's building and put it in place. Mach Mold then invested approximately $20,000 in repairs and parts to get the Machine to operate. The Machine has been operational and in use since May 2003, although Mach Mold describes it as out of alignment and requiring frequent maintenance.

Mach Mold then brought this lawsuit against Clover and Kingman, seeking recovery for the damage to the Machine under the Carmack Amendment, 49 U.S.C. § 14706, to the Interstate

---

[1] Prior to its insolvency, Leading Edge re-sold Mach Mold's Numera boring machine for $26,000. After acquiring Leading Edge's accounts receivable in the bankruptcy sale, KM Industrial indicated that it was not bound by the $45,000 resale credit agreement between Mach Mold and Leading Edge but that it would credit Mach Mold for the actual resale value ($26,000) of the Numera machine. Thus, the net difference between the cost of the Machine and what Mach Mold owes can be calculated as the sales price ($285,000) less the insurance payment ($175,000) less the resale price of the Numera machine ($26,000), or $84,000. For simplicity, this Court will address only the sales price ($285,000) less the insurance payment ($175,000), or $110,000.

Commerce Act, 49 U.S.C. § 13101 *et seq.*, or, as an alternative claim, for common law negligence in shipping and delivering the Machine. Clover and Kingman filed third-party claims against GES Exposition Services; the City of Chicago; and F.H. Paschen/S.N. Nielsen, Inc., a construction firm that was working on Torrence Avenue during the time in question. Kingman asserts negligence claims against GES Exposition Services for its role in loading and unloading the Machine; against the City of Chicago for its role in routing Kingman's driver and in overseeing construction on City streets; and F.H. Paschen/S.N. Nielsen, Inc. for its role in performing construction on City streets. (Kingman Dedicated's Counterclaim and Third-Party Claims, May 17, 2004.) In its third-party complaint, Clover asserts that GES Exposition Services' negligent acts or omissions in loading and unloading the Machine were a proximate cause of the Machine's damage; that KM Industrial Machinery's negligent acts or omissions in discarding in shipping, loading or unloading the Machine were a proximate cause of the Machine's damage; that the City of Chicago was negligent in directing Kingman's driver along a road under construction and in supervising any road construction zones; and that F.H. Paschen/S.N. Nielsen, Inc. was negligent in directing Kingman's trailer through a construction zone and in maintaining a construction zone in accordance with all applicable traffic safety regulations. (Clover's Third-Party Claims, Jun. 24, 2004.) Before this Court are Mach Mold's motion for summary judgment against Clover and Kingman; Clover's motion for partial summary judgment against Mach Mold; Kingman's motion for summary judgment against Mach Mold; GES Exposition Services' motion for summary judgment against Kingman; F.H. Paschen, S.N. Nielsen, Inc.'s motion for summary judgment against Clover and Kingman; and the City of Chicago's motion for summary judgment against Clover and Kingman. In addition, Mach Mold

has requested that the Court strike Kingman's response to Clover's Motion for Summary Judgment and strike Clover's response to Kingman's Motion for Summary Judgment. For the reasons stated below, the motions are granted in part and denied in part.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuinely disputed issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003) (quoting Fed. R. Civ. P. 56(c)). When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *See, e.g.*, *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). A triable fact issue exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Schuster*, 327 F.3d at 573 (quoting *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 321 (7th Cir. 2001) (quotation omitted)).

The movant bears the initial burden of establishing that there is no genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims," the non-movant must then present specific facts showing that there is an issue for trial. *Michael v. St. Joseph County, et al.*, 259 F.3d 842, 845 (7th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)). To successfully oppose the motion, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish

that there is a genuine triable issue. *Celotex*, 477 U.S. at 324. A scintilla of evidence in support of the non-movant's position is insufficient to defeat a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

It is well-settled law in the Seventh Circuit that a party cannot create a dispute about an issue of material fact merely by submitting an affidavit that contradicts earlier deposition testimony. *See Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir. 1999); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996). When deposition and affidavit testimony conflict, the deposition will trump the affidavit unless the statement in the deposition is demonstrated to be mistaken. *See id.* A party cannot defeat a motion for summary judgment by producing a self-serving affidavit that relies on conclusory statements or that is not supported by facts in the record. *See Piscione*, 171 F.3d at 532-33; *Celotex*, 477 U.S. at 324. Finally, an affiant must base his or her statements on personal knowledge. *See Lac du Flambeau Indians v. Stop Treaty Abuse-Wis., Inc.*, 991 F.2d 1249, 1259 (7th Cir. 1993), *citing* Fed. R. Civ. P. 56(e).

A.      Review of Local Rule 56.1 Requirements

The purpose of a summary judgment proceeding is to identify those cases that be resolved without a trial. To that end, the courts in this District have clarified the requirements of summary judgment pleadings in Local Rule 56.1. This rule requires parties to file statements of material facts "as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." N.D. Ill. L.R. 56.1(a)(3). Local Rule 56.1 outlines the obligations of the parties in a summary judgment proceeding. Courts in this district have broad discretion to enforce the rule, and the Seventh Circuit regularly upholds strict enforcement of

Local Rule 56.1. *See, e.g., Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (citing cases).

This Court urges all the parties in this case to review Local Rule 56.1. Judge Castillo's detailed discussion of Rule 56.1 requirements and procedures in *Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill. 2000), provides an excellent guide to proper form for statements of material facts. "There are three separate types of statements governed by Rule 56.1: the movant's statement, the nonmovant's response and statement of additional facts, and the movant's response to the additional facts." *Id.* at 583. Statements of material fact should consist of short statements making specific references to materials supporting the fact set forth in the statement. A nonmovant's statement of facts must "cite specific evidentiary materials" that justify the nonmovant's denial of a movant's factual allegation. A general denial is insufficient. The statement of facts is not the place for argumentative statements; it is also not the place for drawing inferences or making legal arguments. *Malec*, 191 F.R.D. at 584. In addition, the memorandum of law is not the appropriate place to dispute an opposing party's statement of facts; that is the purpose of the response to the statement of facts, which is separate from the memorandum of law. *See* L.R. 56.1(b)(2)-(3). This Court expects parties to comply with the local rules and will not reconfigure party filings for them.

All material facts must be supported by specific references to the record, or, in the case of any disagreement with the opposing party's statement of material fact, by specific references to affidavits or other supporting materials relied upon. But a citation alone is insufficient; a party must also provide the cited material to the Court. This Court cannot consider evidence it does not have before it. In a complex case with multiple cross-motions, such as this, the Court also will

not dig through a party's filings in reference to other motions in the hopes of finding the material cited in, but not attached to, the motion presently before it. As such, a statement of fact which cites to a portion of a deposition or affidavit but fails to provide the relevant portion will be deemed unsupported and therefore inadmissible.

## III.   LEGAL ANALYSIS

### A.   RISK OF LOSS

Clover and Kingman[2] argue that Mach Mold does not have standing to bring any claims on the damaged machine. Specifically, they contend that Mach Mold was not the legal owner of the machine at the time Kingman delivered the machine to Mach Mold's Michigan facility. Instead, Mach Mold purchased the damaged machine from KM Industrial Supply in January 2003, almost four months after the damage at issue. Kingman argues that the original verbal sales agreement was never completed. Under that scenario, Leading Edge purchased the machine from Eumach and brought the machine to the United States. Leading Edge was supposed to sell the machine to KM Industrial Supply, a dealer in industrial machines. KM, in turn, was to sell the machine to Fifth Third Bank, which was to lease the machine on a financial lease to Mach

---

[2] Kingman and Clover separately filed motions for summary judgment against Mach Mold. In addition, Kingman filed a response brief to Clover's motion for summary judgment against Mach Mold and Clover did the same with respect to Kingman's summary judgment motion against Mach Mold. In their "response" briefs, Clover and Kingman essentially seek to adopt the arguments of the moving defendant and ask this Court to enter judgment on their behalf as well as that of the movant. Mach Mold objected to this tactic as an impermissible "end-run" around this Court's deadlines for filing dispositive motions. This Court agrees. Kingman and Clover were given–and took–the opportunity to file summary judgment motions on their behalf by the appropriate deadline. They may not manipulate this Court's scheduling order to get additional opportunities to argue their positions. This Court hereby strikes Kingman's response to Clover's motion for partial summary judgment and Clover's response to Kingman's motion for summary judgment.

Mold, the end-user. Because Mach Mold rejected the damaged machine when it arrived in Benton Harbor, Fifth Third refused to complete the purchase and the parties agreed that the original sales agreement was null and void. Thus, Kingman argues, Leading Edge, not Mach Mold, had the risk of loss when the machine was damaged.

Even if the original sales agreement had been completed, Kingman contends that Leading Edge had the risk of loss until the machine was not only delivered, but also set up and commissioned. In any event, Kingman states that no binding sales contract existed because there was no written memorialization of the sales agreement, as required by the Statute of Frauds. Even assuming that the verbal sales agreement was valid, it was a destination contract because it required the machine to be delivered at a particular destination. The parties characterized the contract as free on board ("FOB") and Kingman contends that the parties understood FOB to mean only that the buyer had to pay the transportation charges. Mach Mold paid KM Industrial $175,000 in January 2003, but this represented a new agreement for the purchase of the machine. Mach Mold knowingly purchased a damaged machine and therefore has no right to recover for damages that occurred prior to its purchase. Finally, Kingman asserts that the September 23, 2002 written sales invoice from KM Industrial Supply to Mach Mold stated that title to the machine would not transfer until the machine was commissioned and accepted.

Mach Mold, for its part, opines that Kingman is unnecessarily complicating the instant litigation. Its contentions that Mach Mold did not own the machine or have the risk of loss contradict the facts established during discovery and the relevant sections of the Uniform Commerical Code regarding free on board ("FOB") shipment contracts. Mach Mold insists it owned the machine and therefore had the risk of loss. Kingman' allegations are based on a self-

serving affidavit by former Leading Edge owner and president, Christopher Bologna, which Mach Mold has moved to strike.[3] In addition, Kingman failed to provide evidence that Fifth Third was the purchaser of the machine. Finally, Mach Mold argues that Kingman has no standing to raise a Statute of Frauds claim.

## 1. Type of shipping contract

Kingman and Mach Mold dispute whether the shipping contract was destination or shipping contract. Kingman contends that it was a destination contract, meaning that title to the machine did not pass from Leading Edge or KM Industrial Supply until the machine was delivered to Mach Mold. Specifically, the shipping contract required the machine to be delivered at a particular location, in this case, Benton Harbor, Michigan. The parties all understood "FOB" to mean only that the buyer had to pay the transportation charges; all parties confirm that the title to the machine did not pass to Mach Mold. Furthermore, Kingman argues that Mach Mold intended for Fifth Third Bank to be the actual purchaser of the machine; Mach Mold then would enter a financial lease with Fifth Third and lease the machine from the bank. When a bank purchases goods, Kingman asserts, the risk of loss does not pass until the goods are commissioned (placed, powered up, tuned, and operator instructed on use). According to Kingman, Leading Edge retained the risk of loss over the machine as a regular course of business. When the damaged machine arrived in Benton Harbor, Mach Mold rejected it; Kingman contends this rejection rendered the sales agreement null and void. Mach Mold argues

---

[3] This Court denies Mach Mold's motion to strike. To the extent that the Bologna affidavit contradicts his prior deposition testimony, is conclusory, not based on personal knowledge, or subject to other evidentiary disqualification, it is admissible and this Court will disregard it.

that the shipping contract for the machine was a shipment contract, where the risk of loss passes to the buyer as soon as the machine was delivered to its point of shipment, in this case, Chicago. Under section 2-509(1) of the Uniform Commercial Code, there is a presumption in favor of a shipment contract. The UCC, moreover, implies that the risk of loss passes to the buyer upon delivery of goods to the carrier (but see § 2-509(1)(a) for "solidification" of this conclusion).

Although the sales contract for the machine was an oral agreement, according to the evidence before this Court, it does not necessarily follow that the contract is unenforceable under the Statute of Frauds. Ordinarily, a contract for the sale of goods for more than $500 must be in writing and must contain certain specified terms or it will be unenforceable under the Statute of Frauds. Unif. Comm. Code § 2-201; *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382 (7th Cir. 1997). However, partial or full performance of the bargain will render an otherwise unenforceable agreement enforceable. *Barber*, 129 F.3d at 388-89; *see also City of Chicago v. Reliable Truck Parts Co., Inc.*, 822 F. Supp. 1288 (N.D. Ill. 1993). In this case, Mach Mold entered a verbal agreement with Leading Edge and KM Industrial Machinery to purchase the Eumach 2150 horizontal milling machine for $285,000. Had the matter stopped there, the agreement would be unenforceable. But as part of the deal, Mach Mold agreed to sell, and Leading Edge agreed to buy, a used Numera boring machine. And on or about September 12, 2002, Leading Edge sent a truck to Mach Mold's facility in Benton Harbor and picked up the Numera machine. Leading Edge was therefore in a better position, because it now had a used machine to resell, which is exactly what it did. Mach Mold was in a worse position, because it no longer had its Numera machine and was waiting for the Eumach machine to arrive. Leading Edge and KM then completed their performance obligations by tendering the machine in good

condition to Mach Mold's carrier, Kingman, at McCormick Place. According to the terms of KM's sales quote to Mach Mold, the sale was FOB point of shipment and the buyer bore all risk of loss after the machine was tendered at the point of shipment. In addition, the sales terms specified that the buyer must seek recovery for any damages to the shipment from the carrier and expressly disclaimed any and all liability for KM.

This Court notes at the outset that Kingman has cited no authority for its proposition that a tortfeasor can claim that an injured party or buyer was not the owner when the seller and the buyer both agree that ownership has passed. In fact, Kingman cites remarkably little authority for any proposition in any of its summary judgment filings. Moreover, in its decision to cite sections of the Michigan code, Kingman fails to provide any justification for its reliance on Michigan, rather than Indiana or Illinois or federal, law, although the parties and the shipment had contacts with all three states and the cause of action arises under federal law. None of the parties addressed choice of law in their filings; such a determination will be necessary, however, as this case proceeds to trial.

The determination of which party bears the risk of loss at a particular time depends on whether the shipment proceeded by shipment or destination contract. *See* U.C.C. § 2-509. The Uniform Commercial Code creates a clear presumption in favor of a shipment contract, which does not require delivery of goods at a particular destination. *See* U.C.C. § 2-503, cmt. 5 ("the 'shipment' contract is regarded as the normal one, and the 'destination' contract as the variant type"). Section 2-509(1)(a) clarifies that the risk of loss transfers to the buyer when the seller delivers the goods to the carrier. The term "F.O.B. point of shipment" as used in KM's terms and conditions of sale is not ambiguous. It specifies that KM, as seller, must tender the goods to

Mach Mold's carrier at the point of shipment. At that time, the risk of loss passes as a matter of law to Mach Mold in accordance with the U.C.C.[4] As such, Mach Mold did have the risk of loss for damage that occurred during transportation of the Machine and therefore does have standing to bring the instant claim against the carriers. This Court has examined the evidence presented, including the quote for shipping the machine and two related panels that Clover prepared for Mach Mold and Kingman's quote to Clover for shipping the machine. There is nothing in the evidence presented to upset the determination that the sales contract for the Machine was a shipment contract, as indicated by the terms "F.O.B. point of shipment" in KM's terms and conditions and by the fact that Mach Mold, the buyer, arranged for a carrier to pick up the Machine from McCormick Place at the end of the IMTS. Thus, this Court denies Kingman's motion for summary judgment.

### B. LIABILITY FOR DAMAGE TO THE MACHINE

#### 1. Applicability of the Carmack Amendment

Mach Mold brought a claim against Clover and Kingman under the Carmack Amendment, 49 U.S.C. § 14706 (1997), which "provides shippers with the statutory right to recover for actual losses to their property caused by carriers." *Allied Tube & Conduit Corp. v. S. Pac. Transp. Co.*, 211 F.3d 367, 369 (7th Cir. 2000). But in order for the Carmack Amendment to

---

[4] Kingman emphasized Mach Mold's attempted rejection of the Machine as evidence that Mach Mold did not have the risk of loss when Kingman arrived in Benton Harbor. This is incorrect. Mach Mold's attempted rejection was ineffective and had no effect on whether Mach Mold bore the risk of loss at the time of transportation. The Machine was damaged after the risk of loss was transferred to Mach Mold and thus, Mach Mold must seek recovery for the damages from the carrier. That is the purpose of the instant litigation.

apply to a claim, the cargo must have been shipped by a "carrier" or "freight forwarder" as defined in the Interstate Commerce Act.

Mach Mold contends that both Clover and Kingman were acting as motor carriers or freight forwarders as defined in the ICA. Thus, the Carmack Amendment should apply to the present litigation. Clover, however, disputes this characterization and asserts that it was acting as not as a carrier or freight forwarder, but rather as a broker. Because the Carmack Amendment applies to carriers and freight forwarders but not to brokers, Clover contends that it should not be held liable under the ICA. This Court must determine, therefore, whether Clover was acting as a carrier or freight forwarder or as a broker in the shipment of the Machine.

The Interstate Commerce Act defines a "motor carrier" as "a person providing motor vehicle transportation for compensation," 49 U.S.C. § 13102(12) (1997), and a "freight forwarder" as "a person holding itself out to the general public (other than as a pipeline, rail, motor, or water carrier) to provide transportation of property for compensation and in the ordinary course of its business ... assumes responsibility for the transportation from the place of receipt to the place of destination; and uses for any part of the transportation a carrier subject to jurisdiction under this subtitle." 49 U.S.C. § 13102(8) (1997). By contrast, the ICA defines a "broker" as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2) (1997).

Ownership of the vehicles used to transport the machine does not determine whether Clover was providing transportation or merely selling the transportation of another carrier. *See*

49 U.S.C. § 13102(12), (14), & (19) (1997). The mere fact that Clover did not use its own motor vehicles in transporting the machine does not preclude it from being a motor carrier for the purposes of the ICA. *See Keller Indus., Inc. v. U.S.*, 311 F. Supp. 384 (N.D. Fla. 1970); *FDL Foods, Inc. v. Kokesch Trucking, Inc.*, 599 N.E.2d 20, 25-27 (1992) (interpreting the Carmack Amendment).

The ICA further specifies that motor carriers provide "transportation" involving "services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit ... of passengers and property." 49 U.S.C. § 13102(19)(B). Thus, even if all parties understood that Clover was to arrange the transportation for the machine, Clover is not necessarily a broker. The Code of Federal Regulations states:

> Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport.

49 C.F.R. § 371.2(a) (2005). Accordingly, if Clover had been authorized to transport the machine and accepted and legally bound itself to do so, it would not be a broker. *Id.* Instead, Clover would be acting as a "motor carrier" for the purposes of the ICA. Indeed, the facts indicate that it is reasonable to conclude that Mach Mold authorized Clover to ship the machine from Chicago to Mach Mold's Benton Harbor facility, and that Clover did so by contracting with Kingman to help. More to the point, Clover has provided no evidence to demonstrate that it registered as a broker as required under the ICA. 49 U.S.C. §§ 13901, 13906(b) (1997). Thus, this Court finds that Clover has raised no genuine material issue of fact on the question of its status under the ICA.

With respect to Kingman's role, however, there is no dispute. Kingman was clearly acting as a motor carrier, as defined in the ICA. As such, Kingman is liable under the Carmack Amendment for any damages to the shipment.

### 2.    Analysis of Carmack Amendment Claim

Under the Carmack Amendment, a shipper first must establish a prima facie case, which consists of (1) delivery of the goods in good condition; (2) arrival in damaged condition; and (3) the amount of damages. *Allied Tube*, 211 F.3d at 369. If the shipper makes such a showing, the burden of production then shifts to the carrier to show that it was not negligent and that the damage to the goods was caused by an excepted cause that relieves it of liability. Excepted causes are "acts of God, the public enemy, the act of the shipper himself, public authority, or the inherent vice or nature of the goods." *Id.* at 369-70 n.2.

First, Mach Mold must show that the Machine was delivered in good condition to Kingman. It is undisputed that Kingman's driver, William Golembieski, signed the Order Form for Outbound Material Handling Services ("Order Form") as acknowledgment that the Machine had been "[r]eceived in apparent good order" and that Golembieski noted no exception to that condition on the form. A bill of lading is evidence of the condition of goods at the time of delivery, although it "may not necessarily establish a prima facie case that an entire shipment was received in good order." *Allied Tube*, 211 F.3d at 371. Although the Order Form specifically states on its face that it is "not a bill of lading," but rather a shipping order, it appears that all the parties in this case treated it as a bill of lading. In fact, no bill of lading was issued, although it is customary for carriers to receive a bill of lading when they pick up a shipment. Thus, this Court finds it is not inappropriate to view the Order Form in this case as analogous to the bill of lading

in *Allied Tube*. In addition, Kingman's driver, who was present and able to inspect the Machine at the time of loading, signed the Order Form to acknowledge that the Machine was received in good condition. Thus, this Court finds that it is reasonable to determine that the Machine was in good condition when Kingman received it.

### a.        Determination of Actual Damages

There is no question that the Machine was delivered in damaged condition, so Mach Mold must show actual damages to establish its prima facie case under the Carmack Amendment. Mach Mold produced evidence from a machinery repair company and from Kingman's insurance company that the Machine was a total loss. *See* Hanaford Ltr., Oct. 7, 2002, Pl.'s L.R. 56.1 Ex. L ("Damage is too extensive for repair or salvaging any parts."); McGuinness Ltr., Mar.4, 2003, Pl.'s L.R. 56.1 Ex. O ("We have ... determined that the CNC machine is a total loss."). Thus, Mach Mold has show that the machine was actually damaged. The value of the Machine when it was delivered in damaged condition was zero.

### 3.        Failure To Provide Protective Packaging Material

In an effort to rebut Mach Mold's prima facie case, Clover and Kingman contend that Mach Mold's claim against them should fail because Mach Mold failed to provide protective packaging material or dunnage for the Machine. Thus, any damage to the Machine was the result of "the act of the shipper" and not of Clover or Kingman's actions. *Allied Tube*, 211 F.3d at 369-70 n.2. Mach Mold responds that there is no evidence that packaging material would have protected the Machine which was, after all, damaged when Kingman's driver hit a roadside pole with the Machine.

The record shows that Kingman received the Machine in good condition at McCormick Place. The record further shows that Kingman knew in advance that the shipment it would receive at McCormick Place was a large Machine which required oversize load permits and an escort car along part of the route. *See* Kingman Dedicated Service Transportation Quote, Sept. 3, 2002, Pl.'s L.R. 56.1 Ex. G; Permits Issued to Kingman Dedicated Service, Pl.'s L.R. 56.1 Ex. I. Further, when it provided a quote for the cost of transporting the Machine, Kingman gave no indication that it required specific packaging material nor did it disclaim liability for damage if the shipment was not contained in any form of protective packaging. *Id.* Clover likewise knew the Machine was oversize and required permits and a flag car. *See* Machinery Supply Fax Quote, Aug. 29, 2002, Pl.'s L.R. 56.1 Ex. D. Clover also failed to request protective packaging or to disclaim liability. *Id.* There is no evidence that a lack of packaging was out of the ordinary in shipping cargo like the Machine. Finally, there is no evidence that the damage to the Machine was caused by the absence of dunnage or protective packaging. Although a crate or other protective packaging might have reduced the damage to the Machine, neither Clover nor Kingman has produced any evidence to demonstrate that it was not negligent. *See Am. Nat'l Fire Ins. Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 930 (7th Cir. 2003) ("*Allied* requires that, in order to rebut the prima facie case, [defendant] must show that it was not negligent.") Neither Clover nor Kingman can rebut Mach Mold's showing that they were negligent.

This Court finds that Clover is a carrier for the purposes of the Carmack Amendment, that Mach Mold successfully established a prima facie case under the Amendment, and that neither Clover nor Kingman have rebutted that case. For these reasons, Mach Mold's partial motion for summary judgment is granted.

## IV.    AVAILABILITY OF "SPECIAL DAMAGES"

Clover seeks partial summary judgment against Mach Mold on the issue of damages. Specifically, Clover asserts that Mach Mold is not entitled to recover special damages, in which Clover includes business interruption losses, because Clover could not foresee and did not have notice of potential lost profits and business interruption costs as the ordinary consequence of breach. Clover contends that Mach Mold did not inform Clover that Mach Mold might lose profits or suffer business interruption if the Machine was not delivered in good condition or by a certain date. Clover admits that a Mach Mold representative told it that the Machine needed to be set up in "a week or two," but argues that this is not sufficient for actual notice of potential lost profit claims. In addition, Clover asserts that it had no way of knowing that a replacement machine would not be available, that Mach Mold would not attempt to repair the Machine if damaged, or that Mach Mold would not be able to subcontract out for work related to the Machine.

Mach Mold argues that the Carmack Amendment gives shippers a statutory right to recover for actual losses to their property caused by carriers. Further, Mach Mold contends that courts have taken an expansive view of "actual loss" and have permitted recovery for non-speculative lost profits and for "reasonably foreseeable consequential damages." *Am. Nat'l Fire Ins. Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 931 (7th Cir. 2003). Mach Mold claims that discovery in this litigation demonstrates that its damages claim is not speculative and notes, moreover, that neither Clover nor Kingman disclosed an expert to show otherwise.

The Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11707 (1997), preempts state common law remedies for negligently-inflicted damage to good shipped by a

common carrier. Under the Carmack Amendment, a motor carrier is subject to "liability ... for the actual loss or injury to the property." 49 U.S.C. § 14706 (1997); *see also Allied Tube & Conduit Corp. v. S. Pac. Transp. Co.*, 211 F.3d 367, 369 (7th Cir. 2000). As noted by the Seventh Circuit, the Supreme Court consistently has construed the Carmack Amendment as imposing much greater liability than actual damages alone. *Am. Nat'l Fire Ins. Co.*, 325 F.3d at 931. The Supreme Court characterized the Carmack Amendment as "comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination." *Southeastern Express Co. v. Pastime Amusement Co.*, 299 U.S. 28, 29 (1936) (internal quotation marks and citation omitted). Thus, an injured party may recover damages for delay, non-speculative lost profits, and all reasonably foreseeable consequential damages. *See id.*; *Camar Corp. v. Preston Trucking Co.*, 221 F.3d 271, 277 (1st Cir. 2000); *Air Prods. & Chems., Inc. v. Ill. Cent. Gulf R.R. Co.*, 721 F.2d 483, 485 (5th Cir. 1983).

The "ordinary measure of damages" in Carmack Amendment cases serves to put the shipper in the position it would have been in had the carrier fully performed, and includes recovery for lost profits. *See Gulf, Colo. & Santa Fe Ry. Co. v. Tex. Packing Co.*, 244 U.S. 31, 37 (1917). Generally, this means that damages will be the difference between the market value of the property in which it should have arrived and the market value of the property in its actual condition upon arrival at its destination. *Id.* In the Seventh Circuit, the shipper remains obligated to pay for the carrier's freight charges and will not be permitted to recover freight expenses as part of any damages. *Am. Nat'l Fire Ins. Co.*, 325 F.3d at 932 (describing the history of excluding freight from shipper's recovery). In certain cases, however, the shipper may recover

freight expenses, such as when the entire shipment is destroyed or useless or when the shipper's cost is used to determine damages. *Id.* at 932-33.

The Carmack Amendment has not changed the common law rule that special damages are not usually recoverable in a breach of contract action. *See Contempo Metal Furn. Co. v. East Tex. Motor Freight Lines, Inc.*, 661 F.2d 761, 765 (9th Cir. 1981). Special damages are those that a carrier would not reasonably foresee as the ordinary consequence of a breach at the time the contract was made. *See id.*; *Hector Martinez & Co. v. S. Pac. Transp. Co.*, 606 F.2d 106, 108-11 (5th Cir. 1989), *cert. denied*, 446 U.S. 982 (1980). In order to recover special damages, the shipper must show that the carrier had notice of circumstances which might lead to such damages. *Contempo*, 661 F.2d at 765; *see also John Morrell Co. v. Burlington N., Inc.*, 560 F.2d 277, 281 (7th Cir. 1977). Under the general rule, notice of special damages must be given when the shipping contract is made. *See F.J. McCarty v. S. Pac. Co.*, 428 F.2d 690, 693 (9th Cir. 1970). The notice requirement permits a carrier to negotiate the contract so as to protect itself from special damages or to decline the shipment altogether. *Contempo*, 661 F.2d at 765. "Because the carrier is taking the risk that events appreciably beyond its control may prevent it from performing the contract, the carrier is entitled to notice of any unforeseeable consequences of nonperformance so that the carrier can protect itself." *Id.* (citation omitted).

"Damage is foreseeable by the carrier if it is the proximate and usual consequence of the carrier's action." *Hector Martinez & Co. v. S. Pac. Transp. Co.*, 606 F.2d 106, 109 (5th Cir. 1979) (citing 11 WILLISTON ON CONTRACTS § 1344, at 226 (3d ed. 1968)).

### A.      Common Law Damages Remedies

"Capital goods such as machinery have a use value, which may equal the rental value of the equipment or may be an interest value." *Martinez*, 606 F.2d at 109. The amount of damages that were reasonably foreseeable is a question of fact that Clover is entitled to present to a jury. *Martinez*, 606 F.2d at 110. But it is worth noting that the general rule of damages does not require that the actual harm suffered be the most foreseeable of all possible harms, but rather that the harm was not so remote as to make it unforeseeable to a reasonable person at the time of contract. *Martinez*, 606 F.2d at 110.

This Court finds that Clover has not met its burden of demonstrating that there remains a genuine issue of material fact on the issue of damages remains in dispute. Case law from the United States Supreme Court and this circuit clearly states that lost profits and all reasonably foreseeable consequential damages may be recovered. This is not to say that Mach Mold has proved that it is entitled to such damages, but rather that Clover has failed to show that it is not. The appropriate amount of damages is an issue for the finder of fact. This Court denies Clover's motion for partial summary judgment.

## V.      THIRD-PARTY CLAIMS

### A.      GES EXPOSITION SERVICES' MOTION FOR SUMMARY JUDGMENT

GES Exposition Services ("GES") has moved for summary judgment on Kingman's third-party negligence claim arising out of GES' failure to provide dunnage and packaging for the Machine prior to loading it onto Kingman's trailer. GES contends that it owed no duty to any party with respect to packing or crating the Machine and that it was not reasonably foreseeable to GES that Kingman would strike a pole with the Machine en route to Mach Mold's facility.

Further, GES argues that it neither unpacked nor packed the Machine and therefore had no duty to warn Kingman that the Machine's packaging and dunnage had been discarded. Because it had no duty to Kingman (or any other party) arising out of the packaging of the Machine, GES contends that its actions or omissions cannot be a proximate cause of the damage to the Machine. Instead, the Machine was in good condition when GES tendered it to Kingman, as evidenced by Kingman's driver's signature on GES' Order Form for Outbound Material Handling Services.

Kingman contends that GES was negligent when it placed two metal electromagnets, each weighing several hundred pounds, on the Machine's table when it set up the Machine for display at McCormick Place. GES failed to secure the electromagnets and did not tell Kingman or Kingman's driver that the electromagnets were not properly secured. Kingman's driver had no way to know that the electromagnets were improperly secured until they slid off the table inside the Machine at some point during transport and damaged the Machine. Damage from the unsecured electromagnets was foreseeable to GES, which is, after all, a company in the business of transporting and loading large machines on commercial trucks. Kingman notes that it would create a *de minimis* burden to require GES to either secure items such as the electromagnets or to warn carriers of unsecured items in cargo. Kingman asserts that GES is strictly liable to Kingman because GES is, like Kingman, a motor carrier for the purposes of the Carmack Amendment. Finally, Kingman contends that its claim against GES is based on common law negligence, not a joint tortfeasor theory of liability and is not precluded by the Carmack Amendment.

GES responds that there is no disputed issue of fact that the Machine was damaged by striking a pole while in transport with Kingman from McCormick Place to Benton Harbor,

Michigan. Kingman's third party complaint deals only with whether GES properly crated and/or packaged the Machine for shipment; the complaint makes no reference to the electromagnets or GES' responsibility for placing anything on or inside the Machine. Indeed, the first mention of the electromagnets comes in Kingman's response to GES' motion for summary judgment. The electromagnets are not mentioned in Kingman's third-party complaint nor in its filings against other parties. In addition, GES argues that Kingman, as a motor carrier subject to the Carmack Amendment, cannot seek contribution from GES on a joint tortfeasor theory. Specifically, Kingman's third-party claim makes no allegation that it suffered damages independent of the underlying claim against it by Mach Mold; therefore, there can be no question that this is a contribution action based on impermissible joint tortfeasor liability. Finally, GES denies that it is a motor carrier for the purposes of this lawsuit and notes that the cases on which Kingman relies can be factually distinguished.

This Court declines to find that Kingman's third party claim precludes any potential negligence claim relating to the electromagnets. A party is not required to plead with specificity under the federal rules of civil procedure, but simply put the opposing party on notice of the claims against it. *See* Fed. R. Civ. P. 8(a). GES does not deny that it placed the electromagnets on or inside the Machine nor that it failed to inform Kingman's driver that the electromagnets were unsecured. Whether the electromagnets were secured or not falls within the outer ambit of Kingman's claim relating to packaging and dunnage for the Machine; it is reasonable to conclude that the use of packaging or dunnage might have served to secure the electromagnets so that they could not be dislodged during transportation. The terms and conditions listed on GES' Order Form for Outbound Material Handling Services specifiy that "GES' liability shall be

limited to any loss or damage which results solely from GES' negligence in its actual physical handling of the items comprising Exhibitor's shipment(s), and not for any other type of loss or damage." (GES Order Form Terms & Conds. ¶ 5, Mach Mold Resp. to Kingman's L.R. 56.1 Stmt. Ex. G, at 2.) This Court cannot determine, as a matter of law, whether the damage to the Machine was solely the result of GES' negligence in placing the electromagnets on the Machine's table without securing them or notifying Kingman that they were unsecured. That is a question for the finder of fact.

To succeed on a negligence claim, a plaintiff must prove that the defendant owed a duty to the plaintiff, breached that duty, and the breach was the proximate cause of the plaintiff's injuries. *Thompson v. County of Cook*, 609 N.E.2d 290, 293 (Ill. 1993) (citing *Wojdyla v. City of Park Ridge*, 592 N.E.2d 1098, 1100 (Ill. 1992)). The existence of a duty must be determined as a matter of law, whereas the breach and proximate cause determinations are questions of fact. *First Nat'l Bank v. City of Aurora*, 373 N.E.2d 1326, 1331 (Ill. 1978). If, however, reasonable persons could only come to one conclusion based on the evidence, then the question of proximate cause may be decided as a matter of law. *Sokolowski v. All Points Distribution Serv., Inc.*, 612 N.E.2d 79, 82 (Ill App. Ct. 1993). When a defendant's negligence merely creates a condition that could lead to the injury or damage at issue, such negligence is not the proximate cause of the injury. In addition, there is no proximate cause if a third person's independent acts break the causal connection between the alleged negligence and the injury. *Thompson*, 609 N.E.2d at 294. Instead, the independent act is the proximate cause of the injury. *Id.*

In this case, GES allegedly placed two large metal blocks which weighed in excess of several hundred pounds on table of the Machine without securing them. When GES loaded the

Machine onto Kingman's trailer for transportation to Michigan, it failed either to secure the electromagnets or to inform Kingman's driver that the electromagnets had not been secured. Kingman's driver then drove the trailer from Chicago to Benton Harbor, Michigan. At some point before reaching the I-94 entry ramp in Chicago, the driver struck a roadside pole with the load, causing damage to the Machine. The record established that GES employees were aware that the Machine was going from McCormick Place to Benton Harbor, Michigan by tractor trailer. It was foreseeable that the large, heavy, unsecured metal blocks placed on a table in the Machine might move, fall, or otherwise change position during transit and, given their size and weight, might damage the Machine. This Court finds that GES' conduct consisted of more than merely furnishing a condition that could lead to the injury. Thus, proximate cause cannot be determined as a matter of law but remains a question of fact. GES' motion for summary judgment is therefore denied.

### B.   F.H. PASCHEN/S.N. NIELSEN, INC.'S MOTION FOR SUMMARY JUDGMENT

F.H. Paschen/S.N. Nielsen, Inc. ("Paschen") has filed a motion for summary judgment on Counts IV and V of Clover's Third-Party Claim and on Count III of Kingman's Third Party Claim. Paschen had a contract with the City of Chicago to perform work on the northbound lanes of Torrence Avenue in the area approximately between 126th Street and 130th Street. Paschen contends that Clover and Kingman fail to present competent evidence in support of their negligence claims. Specifically, Kingman's driver cannot identify where on Torrence Avenue the accident occurred; cannot remember whether he saw any identifying information relating to the construction company overseeing the area where the accident occurred; does not know if the pole he allegedly struck was involved with the construction or not; and does not know if Paschen

did anything to or with the pole he allegedly struck, or if Paschen was even working in the area where the pole was located. Moreover, as a trained professional truck driver, Kingman's driver had a responsibility not to hit a fixed object along his route with his cargo load. In addition, Paschen alleges that it had no way to know the City would route an oversized load along Torrence Avenue through a construction zone. Thus, Paschen contends there is no evidence that it owed a duty to either Clover or Kingman, no evidence that it was negligent, and no evidence that any negligence was a proximate cause of the damage to the Machine.

Clover responds that the accident occurred in a construction zone controlled by Paschen. Further, Clover alleges that Paschen negligently failed to comply with the Illinois Manual on Uniform Traffic Control Devices ("MUTCD") and its contract with the City of Chicago, which required Paschen to take "all necessary precautions" to protect life and property. Paschen argues that Clover has not proved that Paschen controlled the area where the accident occurred because Kingman's driver, the only witness to the accident, cannot remember where it occurred. Even if the accident undisputedly occurred in the Paschen construction zone, Paschen asserts that location alone cannot create an inference of negligence. Finally, Paschen argues that Clover's reference to the Illinois MUTCD is irrelevant because there is no evidence that Paschen did or did not comply with it.

Kingman, in turn, contends that the only construction on Torrence Avenue during the time in question was the Paschen construction work. In addition, Kingman opines that both the City and Paschen had a duty to reasonably perform this construction and not to act negligently. Paschen responds that it owed no duty to Kingman, that Kingman cannot even establish that the

accident occurred in Paschen's construction zone, and that Paschen did not know and could not foresee that the City would route an oversized load through a construction zone.

"In resolving whether a duty exists, a court must determine whether there is a relationship between the parties requiring that a legal obligation be imposed upon one for the benefit of the other." *Rhodes v. Ill. Cent. Gulf R.R.*, 665 N.E.2d 1260, 1267 (Ill. 1996). In making this determination, a court will consider whether injury was reasonably foreseeable or likely, and how difficult it would be for the defendant to guard against such an injury and the burden it would impose upon a defendant to be required to do so. *Jackson v. TLC Assocs., Inc.*, 706 N.E.2d 460, 463 (Ill. 1998). In order for a duty to be imposed, the injury or damage at issue must have been reasonably foreseeable. *Cunis v. Brennan*, 308 N.E.2d 617, 619 (Ill. 1974). In the instant case, Kingman's driver was driving along Torrence Avenue when he came to a construction zone where all north- and southbound traffic was routed into what had been the two southbound lanes of traffic. Northbound traffic travelled in one lane, southbound traffic in the other. Kingman's driver entered this construction zone with an oversized load which overhung the edges of the trailer by approximately two feet, according to his deposition testimony. The southbound traffic lanes of Torrence Avenue were approximately eleven to twelve feet wide. The lane widths were not altered for construction. Paschen had a construction contract to work on the eastern side of Torrence Avenue, and did not work on the western (or southbound lanes). Paschen did not move or place any poles on the western side of Torrence Avenue. Kingman's driver could not recall where the accident occurred, whether it occurred in the vicinity of Paschen's construction zone, or what kind of pole he struck. The facts indicate that the Kingman had oversize permits that permitted a load of no more than twelve feet six inches in width. (*See*

Illinois Permit No. 1161530; Michigan Permit, Sept. 16, 2002; Indiana Permit No. 2002256030218; Chicago Permit No. 225698882, Mach Mold L.R. 56.1 Stmt., Ex. J.) If Kingman's trailer had been this wide, it would have exceeded the width of the lane of traffic on Torrence Avenue in the area where the two-way traffic pattern was routed on two adjacent lanes. However, the evidence is not clear that Kingman's trailer or the Machine, as loaded on the trailer, was as wide as the permits' maximum allowable width. In fact, Kingman's driver testified in his deposition that the trailer was eight feet six inches wide and the Machine overhung the trailer by one foot on each side, making the Machine ten feet six inches wide. (Golembieski Dep., at 110.) Golembieski stated that he measured the width of the Machine at the time it was loaded on Kingman's trailer and, although he did not remember the exact width, it was less than the maximum allowed in his permits. (*Id.*) Subsequently, however, Kingman filed an affidavit from Golembieski, in which he stated that the Machine was 149 inches wide, or twelve feet five inches. (Golembieski Aff. at ¶ 3.) Golembieski's affidavit provides no support for this statement of any kind. As it conflicts with his sworn deposition testimony, it will be disregarded.

Fatal to both Clover and Kingman's third party claims, however, is the unavoidable fact that they cannot establish that the accident occurred in the zone where Paschen was performing construction. The only witness to the accident is Kingman's driver, and he was able to provide no more specific testimony than that the accident occurred on Torrence Avenue somewhere between 95th Street and 130th Street. Kingman asserts that Paschen was the only firm performing work on Torrence Avenue during the time in question but provides no evidence to support this assertion. Assuming, however, that the accident did occur in the area between 126th Street and 130th Street where Paschen was working, neither Kingman nor Clover has met its burden of

proving that Paschen owed a duty to it. Both suggest that Paschen failed to comply with the requirements of its contract with the City of Chicago regarding traffic control and lane closures. There is no evidence, however, that Paschen or its subcontractor were negligent in closing the northbound lanes of traffic or that they failed to post all required signage. Paschen's project engineer testified that the lane closure was done according to drawings supplied by the City of Chicago. Moreover, Paschen's project engineer submitted daily progress reports to a resident engineer who represented the City. The City's resident engineer and program manager held weekly on-site meetings with Paschen's project engineer. No evidence before this Court suggests that any representative of the City determined that Paschen had failed to comply with its contractual obligations regarding traffic safety and lane closure. This Court therefore finds that it was not reasonably foreseeable to Paschen that an injury of the type at issue here would occur.

Even assuming that Paschen owed a duty to Clover and/or Kingman, and that Paschen breached that duty–which this Court declines to find–the third-party plaintiffs still must show that this breach was a proximate cause of their injury. *See Barham v. Knickrehm*, 661 N.E.2d 1166, 1169 (Ill. App. Ct. 1996). The burden is on the plaintiffs to "affirmatively and positively show" that the defendant's alleged negligence caused plaintiffs' injury. *See McInturff v. Chicago Title & Trust Co., Inc.*, 243 N.E. 2d 657, 662 (Ill App. Ct. 1968). A plaintiff may demonstrate proximate cause through both circumstantial and direct evidence. *See id.* at 663 . But proximate cause may not be based on "mere surmise, guess, or conjecture as to the cause of the injury." *Bermudez v. Martinez Trucking Co.*, 796 N.E.2d 1074, 1078 (Ill. App. Ct. 2003). Instead there must be reasonable certainty that defendant's acts or omissions caused plaintiffs' injury. *See Salinas v. Werton*, 515 N.E.2d 142, 144 (Ill. App. Ct. 1987). In the case before this Court,

plaintiffs argue that Paschen failed to properly mark and/or maintain the southbound lanes of Torrence Avenue adjacent to its construction site and that this negligence proximately caused the accident that damaged the Machine. However, after reviewing the record in the light most favorable to the plaintiffs, this Court cannot find that this inference is reasonable given the incomplete and uncertain evidence presented. Therefore, this Court grants Paschen's motion for summary judgment against both Clover and Kingman.

### C. CITY OF CHICAGO'S MOTION FOR SUMMARY JUDGMENT AGAINST CLOVER AND KINGMAN

#### 1. Golembieski Affidavit

At the outset, this Court will address the admissibility of the affidavit by William Golembieski, Kingman's driver at the time of the incident. Kingman submitted Golembieski's affidavit in its L.R. 56.1(b) response to the City's motion for summary judgment and the City has contested its admissibility.[5] In his affidavit, however, Golembieski fails to provide an explanation for his marked improvement in memory about the exact size of the Machine on his trailer, the width of the lanes of traffic in which he was travelling, the possible causes for the incident, and the route he was following. To the extent that Golembieski's affidavit fails to comply with the requirements of Rule 56(e) that affidavits be "made on personal knowledge, ... set forth such facts as would be admissible in evidence, ... and show affirmatively that the affiant is competent to testify to the matters stated therein," it will be disregarded. Fed. R. Civ. P. 56(e); *see Automatic Radio Mfg. Co. v. Hazeltine Research Inc.*, 339 U.S. 827, 831 (1950). Specifically, paragraphs 3, 4, 5, 6, 8, 9, 10, 11, 12, and 13 are hereby struck as inadmissible.

---

[5] This Court notes that Paschen also has contested the admissibility of the Golembieski affidavit.

## 2.    Tort Immunity Act and Ministerial or Discretionary Functions

The City of Chicago moves for summary judgment on Clover and Kingman's Third Party negligence claims against it. The City issued a permit to Kingman to transport an oversize load between September 13, 2002 and September 30, 2002, over City streets, including Torrence Avenue. The City contends issuing a permit was its only involvement with the events underlying this litigation. To that end, the City alleges that the Illinois Tort Immunity Act grants absolute immunity from liability for issuing a permit to the City in situations such as this. 745 ILCS 10-2-104. Specifically, the City contends that the Tort Immunity Act is absolute and precludes finding any duty to parties such as plaintiffs in this matter. In addition, the City contends that third-party plaintiffs' claims for contribution are based on "mere speculation," which is insufficient to establish liability for negligence. As support, the City asserts that neither Kingman nor Clover has provided any evidence that any act or omission by the City caused the accident.

The plain language of section 2-104 states that a "local public entity is not liable for an injury caused by the issuance, denial, suspension, or revocation of, or by the failure or refusal to issue, deny, suspend, or revoke, any permit, license, certificate, approval, order, or similar authorization where the entity or its employee is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended, or revoked." 745 ILCS 10/2-104 (West 2000). The section does not distinguish between ministerial and discretionary acts, despite third-party plaintiffs efforts to so distinguish. The Illinois Appellate Court declined to construe the statute as including a discretionary/ministerial distinction in *Doyle v. City of Marengo*, 783 N.E.2d 1052, 1054 (Ill. App. Ct. 1999).

In *Doyle*, a group of homebuyers who were required to purchase flood insurance sued the City of Marengo for issuing occupancy permits without first obtaining letters of map revisions to determine that the homes were not in a flood plain. As it turned out, the homes were located in a flood plain and the residents had to purchase flood insurance. The City argued that it was immune under the Tort Immunity Act; the home buyers contended that issuing permits was a ministerial function for which there was no immunity. The Illinois Appellate Court held that section 2-104 of the Tort Immunity Act only provided an exception to immunity in cases of bad faith or malicious motives, and did not distinguish between discretionary and so-called ministerial functions. *Doyle*, 783 N.E.2d at 1054. Thus, the City had no duty to determine if a property lay within a flood plain before issuing a permit for housing.

The City of Chicago argues that the facts of the instant case are similar to those in *Doyle*. The City issued a permit to Kingman allowing it to transport an oversize load on City streets. Kingman and Clover contend that this was a ministerial act for which no government tort immunity applies. Clover relies on *In re Chicago Flood Litigation*, 680 N.E.2d 265, 272-73 (Ill. 1997), to support its contention that the City acted in a ministerial fashion. The Illinois Supreme Court there defined an official duty as "ministerial, when it is absolute, certain and imperative, involving merely the execution of a set task, and when the law which imposes it, prescribes and defines the time, mode and occasion of its performance with such certainty, that nothing remains for judgment or discretion." *Chicago Flood*, 680 N.E.2d at 273. The City argues that issuing an oversize permit is a discretionary function, in that the City retains the discretion to issue or deny the permit, and, if it chooses to issue it, to determine the route the oversize load must follow and the times of day it may travel. In addition, the City contends that Clover's reliance on *Chicago*

*Flood* is misplaced because the Illinois Supreme Court held there that the City's contractually-mandated supervision of its contractor's construction activity was discretionary, not ministerial, in that the City was able to alter the specifications of the contract work as it thought best. *Chicago Flood*, 680 N.E.2d at 273. Moreover, the Tort Immunity Act does not distinguish between ministerial and discretionary acts but rather provides near-absolute immunity for the issuance of permits such as this. In addition, the City points to the Illinois Supreme Court's 2001 decision rejecting the argument that the denial of a zoning permit by a village's planning commission was ministerial and holding that § 2-104 grants immunity for injury caused by the "denial [of] any permit." *Village of Bloomingdale v. CDG Enters., Inc.*, 752 N.E.2d 1090 (Ill. 2001).

This Court finds that the evidence presented fails to demonstrate any dispute of material fact over the nature of the oversize permit. Given the Illinois courts' finding that section 2-104 immunizes both ministerial and discretionary permit granting and the generous language of the Illinois statute, this Court finds that the City is immune under the Illinois Tort Immunity Act. Summary judgment for the City is appropriate.

### 3. Alleged Negligence In Road Construction

Clover and Kingman contend that the City was negligent in its supervision of its contractor's work on a road construction project on Torrence Avenue where the accident is alleged to have occurred. Specifically, the third-party plaintiffs contend that the City negligently failed to comply with the Illinois Manual on Uniform Traffic Control Devices in posting all required traffic signs at and around the construction zone, which they asserts was a proximate cause of the accident. Further, Clover and Kingman contend that the City negligently created an

unsafe condition in the construction area when it failed to post all required signage and is therefore liable under § 3-103(a) of the Tort Immunity Act. 75 ILCS 10/3-103(a) (West 2000). The placement of warning signs is a mandatory, ministerial duty. *See Snyder v. Curran Township*, 657 N.E.2d 988 (Ill. 1995).The third-party plaintiffs argue that once the City agrees with a contractor to perform work on public property, "the work must be done with reasonable care and in a nonnegligent manner.... When a city creates a hazardous condition and someone is injured as a consequence, it must respond in damages." *Washington v. City of Chicago*, 720 N.E.2d 1030, 1033 (Ill. 1999). Clover and Kingman contend that the City's decision to route an oversize shipment through a construction area was negligent and the City must be found liable.

The City argues that Clover's reliance on the MUTCD and the alleged placement or misplacement of traffic signage is irrelevant because Clover has neither alleged that the City was negligent in complying with the MUTCD nor produced any evidence that would demonstrate such negligence. In addition, the MUTCD does not specify or govern when, whether, or where a municipality must place signs. In fact, the MUTCD does not supercede Illinois law immunizing a local public eneity for "injury caused by the failure to initially provide regulatory traffic control devices...." 745 ILCS 10/3-104 (West 2000); *see Snyder*, 657 N.E.2d at 994. Whether the Tort Immunity Act does or does not provide immunity for the initial placement of traffic control devices is ultimately beside the point for the purpose of this case. The third-party plaintiffs have failed to produce any evidence that the City did not place traffic control devices at and around the construction zone. This Court takes all evidence in the light most favorable to the non-movant, but it will not create evidence where there is none. It remains undisputed that the only witness to the accident, Kingman's driver William Golembieski, cannot remember where the

accident occurred, whether he saw any traffic signs, what the signs might have said or where they were located. Furthermore, Golembieski stated that he did not have an opinion as to the cause of the accident. Given Clover and Kingman's inability to provide any evidence that the City was negligent regarding the placement of traffic control devices, summary judgment for the City is appropriate.

Thus, this Court grants the City's motion for summary judgment against Clover's Count III and Kingman's Count III.

## Conclusion

For the foregoing reasons, Mach Mold's Motion for Partial Summary Judgment is granted; Clover's Motion for Summary Judgment is denied; Mach Mold's Motion to Strike Kingman's Response to Clover's Motion for Partial Summary Judgment is granted; Kingman's Motion for Summary Judgment is denied; Mach Mold's Motion to Strike Affidavit of Christopher Bologna is denied; Mach Mold's Motion to Strike Clover's Response to Kingman's Motion for Summary Judgment is granted; GES Exposition Services' Motion for Summary Judgment is denied; F.H. Paschen/S.N. Nielsen, Inc.'s Motion for Summary Judgment is granted; and the City of Chicago's Motion for Summary Judgment is granted.

Enter:

/s/ David H. Coar

_____

David H. Coar
United States District Judge

Dated: **August 17, 2005**